**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **CRESTVIEW CAPITAL MASTER, LLP, MIDSUMMER INVESTMENT, LTD., KUAII PARTNERS, L.P., on behalf of Themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DUANE MARTIN, an individual; MARC FRY, an individual; JOHN LEVY, an individual, and UNIVERSAL FOOD & BEVERAGE COMPANY, INC., a Nevada corporation,**<br><br>**Defendants.** | **Case No.** FILED: JUNE 05, 2008<br>08CV3263<br>JUDGE KOCORAS<br>MAGISTRATE JUDGE COLE<br>RCC |

**COMPLAINT**

Plaintiffs, CRESTVIEW CAPITAL MASTER, LLP ("Crestview"), MIDSUMMER INVESTMENT, LTD. ("Midsummer"), and KUAII PARTNERS, L.P. ("Kuaii") by and through their attorneys, Touhy, Touhy, Buehler & Williams, hereby file their complaint against Duane Martin, an individual; Marc Fry, an individual; and John Levy, an individual, and state as follows:

## I.     NATURE OF THE COMPLAINT

1.     Plaintiffs bring this action under the Securities Exchange Act of 1934 on behalf of all persons who purchased or acquired preferred stock issued by Universal Food & Beverage Company, Inc. ("Universal") on or about February 16, 2006 (the "Class Period") in an offering in which approximately $20 million of this preferred stock was sold. Plaintiffs contend that the sale of

this preferred stock was improperly and fraudulently made by Defendants who are former officers and directors of Universal.

2.    From at least June of 2005 through June of 2006. Defendants, in connection with the sale of these securities. misrepresented the financial condition of the company and mislead investors about the primary use of proceeds from the sale of the preferred stock and other securities issued by Universal in an attempt to inflate stock price and give the impression that Universal was a viable company when, in fact. it was insolvent. In addition, during the period prior to the offering and sale of the preferred stock. Defendants grossly and fraudulently misused company funds for personal use and intended to use the capital raised in the preferred stock offering to hide their defalcations and to divert additional capital for their personal use. The preferred stock of Plaintiffs and the Class is now worth next to nothing and Universal was forced to file a Chapter 11 Bankruptcy as a result of the officer and director Defendants' fraudulent activities.

## ALLEGATIONS COMMON TO ALL COUNTS

### II.    THE PARTIES

3.    a.    Plaintiff Crestview purchased  3.000 shares of stock in the offering of Series A Preferred Stock of Universal Food & Beverage Co. at $1.000 per share. as described in the company's 8-K for the period ending February 15. 2006.

b.    Plaintiff MidSummer purchased 3.000 shares of stock in the offering of Series A Preferred Stock of Universal Food & Beverage Co. at $1,000

2

per share, as described in the company's 8-K for the period ending February 15, 2006.

      c.    Plaintiff Kuaii purchased 2.500 shares of stock in the offering of Series A Preferred Stock of Universal Food & Beverage Co. at $1,000 per share, as described in the company's 8-K for the period ending February 15, 2006.

4.    a.    Defendant Universal, a debtor in bankruptcy, is a Nevada Corporation formed on August 20, 1996, under the name "Hayoton Company Incorporated." Universal filed reports with the Securities and Exchange Commission, and is subject to the Securities Exchange act of 1934. Universal was the issuer of the Series A Preferred Stock purchased by Midsummer and the Class alleged herein.

      b.    After several name changes, Hayoton became "Cardinal Minerals, Inc." on March 2, 2005, Cardinal Minerals eventually became "Universal Food & Beverage Company," as more fully described below.

      c.    As stated in Universal's Form 10KSB for the period ending 12/31/05, on September 28, 2004, Cardinal Minerals entered into a Share Purchase agreement and Plan of Reorganization, (the "Reorganization Agreement") with Universal Food & Beverage Company, a Delaware corporation ("Universal Delaware") and its shareholders, which provided that shareholders and owners of Cardinal Minerals receive approximately nine (9%) percent of Universal Food & Beverage in a reverse stock split (the "Share Exchange").

d. On March 2, 2005, as a result of the Share Exchange and other transactions contemplated by the Reorganization Agreement, including a reverse acquisition, Universal Delaware became a wholly owned subsidiary of Cardinal Minerals, and Cardinal Minerals amended its Articles of Incorporation and changed its name to "Universal Food & Beverage Company."

e. Universal provided a variety of beverage bottling services to branded beverage companies and private label customers. In addition, Universal developed its own brand of beverage products and provided turn key solutions for product development including bottle design labels, formula development and collateral materials.

f. On April 2, 2006, August Liguori became Universal's Chief Financial and Administrative Officer. On June 1, 2006, Liguori assumed the position of Chief Executive Officer and Secretary of the company. On that same day, Defendant Martin resigned his position as the Chief Executive Officer of Universal. On or about August 21, 2007, Mr. Liguori executed a Certificate of Resolution (the "Resolution") declaring that it was the judgment of the Board of Directors that Universal should file a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Bankruptcy Code. Prior to the decision to file for protection under Chapter 11 of the Bankruptcy Code, Universal's headquarters were located at 3830 Commerce Drive, St. Charles, Illinois 60174.

5. On March 5, 2005, following the Share Exchange, Defendant Duane N. Martin ("Martin") became a Director of Universal and assumed the

titles of Chairman of the Board and Chief Executive Officer. Prior to assuming these positions, Martin was a Director, Chairman of the Board of Directors, and Chief Executive Officer of Universal Delaware.

6.    Also following the Share Exchange, Defendant Mark Fry ("Fry") assumed the position as Director and President of Universal. Before assuming these positions, Fry had been a Director, President and Chief Operating Officer of Universal Delaware.

7.    Defendant John F. Levy was appointed interim Chief Financial Officer and Secretary on November 28, 2005.

## II.    **JURISDICTION AND VENUE**

8.    Plaintiffs' claims are brought pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

9.    The Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).    Universal maintained its principal executive offices in this District and many of the acts and transactions alleged herein, including the preparation and dissemination of statements containing materially false and misleading information and omissions of material fact, occurred in substantial part in this District.

11.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants directly or indirectly used the means and

instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities exchange, to orchestrate their fraud.

## III.  BACKGROUND FACTS

**A.  Issuance of False Press Releases and Other Misrepresentations in Securities Filings**

12.    In the spring of 2005, Universal's stock price was declining and highly volatile. From early June, through September 2005, in an attempt to increase Universal's stock price, Martin misrepresented Universal's financial condition by issuing false press releases, misrepresenting information and omitting facts concerning the financial condition of Universal in the company's SEC filings.

**False Press Releases**

13.    In an attempt to inflate the price of Universal's stock, from early June through September 2005, Martin caused the following false press releases to be issued:

   a. June 7, 2005, entitled "Initial Orders Top $10 Million," stating that, "Expansion plans are underway to increase its current production facilities tenfold with capacity of 17 million cases over the next 12 months," with the addition of the "gallon packaging and high speed lines to be completed in Q-3 of 2005...:"

   b. June 23, 2005, entitled "Universal Food and Beverage Launching Healthful Drink Line," introducing a new company-owned brand line, Frost20™, slated for delivery July 5, 2005:

   c. June 27, 2005, stating that Universal's hot fill line was operational, adding over an eight million case capacity annually, translating to $22 million in potential additional revenue:

    d. July 5, 2005, entitled "Universal Food and Beverage Enlists National Food Brokers," describing a favorable business partnership with three leading national food brokers;

    e. August 23, 3005, describing a new high pilot plant facility in St. Charles, Illinois; and

    f. September 2, 2005, touting Universal as "creating a buzz on the OTC Bulletin Board" with "some of the most recognized brands in the world dying to do business with Universal."

14.    From June thorough September 2005, Martin knew or was reckless in not knowing that the information contained in the press releases was false, misleading, or otherwise incorrect, yet he still ordered them to be sent. Martin failed to issue any additional releases or filings to correct the aforementioned misstatements.

15.    In this same time period, Martin also made a number of false statements relating to the misuse of corporate funds through Universal's SEC filings. Martin represented in Universal's Form 10-Q for the quarterly period ended June 30, 2005 that "Based on their evaluation, our principal executive officer and principal financial officer have concluded that [Universal's] controls and procedures were effective as of June 30, 2005."

16.    Martin knew or was reckless in not knowing that the information contained in the June 30, 2005 10-Q was false, misleading, or otherwise incorrect, yet he failed to issue any additional releases or filings to correct it.

17.    In fact, Universal's operations and quality at this time were sub-par and the equipment was running poorly.

18.    Additionally, Martin represented in Universal's Form 10-Q for the quarterly period ended September 30, 2005 that:

"[s]ubsequent to the end of the quarter, on October 18, 2005, the Company registered 3,250,000 shares and issued 2,412,500 shares of common stock via an S-8 registration form to be used to pay consultants for future services." Further, Martin represented that "This equity compensation is one of the ways that the Company is using non-cash means to pay for required services to conserve cash."

19.     Martin knew or was reckless in not knowing that the information contained in the September 30, 2005 10-Q was false, misleading, or otherwise incorrect, yet he failed to issue any additional releases or filings to correct it.

20.     In fact, Martin knew all along that the S-8 program was improper because he intended to use, and in fact did use, the S-8 program to raise capital and repay promoters for past efforts to raise capital for the company, instead of merely using it as represented as a non-cash means to pay consultants and to conserve cash.

**The Fraudulent S-8 Stock Program**

21.     In July, 2005, the Defendants began to explore the possibility of issuing additional shares of stock under an S-8 exemption.

22.     The S-8 exemption allows companies to issue shares to employees, consultants, and/or advisors of the company under the company's stock incentive program. However, in order to qualify to receive such stock, the consultants and/or advisors cannot have any influence over the price of the stock or to any person that assists or otherwise renders services to the company relating to the raising of money for the company. The rules of the S-8 exemption do not allow shares to be issued to an individual for work done in the past.

8

23.    On October 18, 2005, Universal filed documents with the SEC registering 3,250,000 shares of Universal stock to be used to compensate outside consultants (S-8 Stock).

24.    Pursuant to the registration documents as limited by federal securities law, none of the S-8 stock was to be used to promote Universal's stock or to raise capital.

25.    Between July 22, 2005 and October 19, 2005, Universal's outside General Counsel Carl Neumann met with Martin to discuss the use of S-8 stock.    On September 27, 2005, Neumann circulated final consulting agreements that included a specific provision (paragraph 4 of Rider B-1) stating that none of the S-8 stock should be used for "capital raising" or "stock promotion."

26.    However, on or about October 19, 2005, Universal improperly issued stock to twelve different stock promoters and/or individuals involved in raising capital for Universal. These people included:

| Name | Number of shares | Value | Date |
|------|-----------------|-------|------|
| William Buzogany | 100,000 shares | $105,000 | 10/19/05 |
| Tom Clay | 150,000 shares | $157,000 | 10/19/05 |
| Geoffery Eiten | 100,000 shares | $105,000 | 10/19/05 |
| Matt Kohovec | 100,000 shares | $315,000 | 10/19/05 |
| John Mathues | 300,000 shares | $105,000 | 10/19/05 |
| Keith Miller | 10,000 shares | $10,500 | 10/19/05 |
| Robert Munro | 300,000 shares | $315,000 | 10/19/05 |

| | | | |
|---|---|---|---|
| Sandra Redfield | 25,000 shares | $ 26,500 | 10/19/05 |
| Daniel Seifer | 25,000 shares | $ 26,500 | 10/19/05 |
| Patricia Shull | 180,000 shares | $189,000 | 10/19/05 |
| Gary Trump | 300,000 shares | $315,000 | 10/19/05 |
| Darryl Uselton | 50,000 shares | $52,000 | 10/19/05 |

27.    In addition to those individuals, Universal improperly issued S-8 stock to other individuals who do not appear to have contributed any goods or services to Universal. These individuals include:

| Name | Number of shares | Value | Date |
|---|---|---|---|
| John Dusek | 100,000 shares | $105,000 | 10/19/05 |
| Norman Duval | 100,000 shares | $105,000 | 10/19/05 |
| David Gray | 25,000 shares | $26,250 | 10/19/05 |
| David Gray | 75,000 shares | $57,750 | 2/10/06 |
| Frank Petrosino | 100,000 shares | $105,000 | 10/19/05 |
| Ray Singletary | 100,000 shares | $105,000 | 10/19/05 |
| Randy Trau | 100,000 shares | $105,000 | 10/19/05 |
| Robert Wadington | 12,500 shares | $13,125 | 10/19/05 |
| Robert Wadington | 37,500 shares | $28,875 | 02/10/06 |

28.    Two individuals appear to have improperly received S-8 stock for preexisting Universal debt obligations. These individuals include:

| Name | Number of shares | Value | Date |
|---|---|---|---|
| Keneth Bain | 85,000 shares | $89,250 | 10/19/05 |
| Hilton Kahn | 50,000 shares | $52,500 | 10/19/05 |

29.    The total number of ineligible shares issued by Universal under the S-8 stock program was 2.575.000 shares worth a total of $2.630,250 at the time they were issued.

30.    After the improper issuance of shares in October of 2005, Defendants continued to make representations concerning the financial condition of Universal. this time in connection with a securities purchase agreement.

## False Statements in the Universal Food & Beverage 8-K for the Period Ending February 15, 2006

31.    On February 15, 2006. Universal entered into a Securities Purchase Agreement (Exhibit A hereto) with fourteen accredited investors, including Plaintiffs. as stated in Universal's 8-K for the period ending on the same date. The board of directors designated a series of 30,000 shares to be issued as a single series to be known as "Series A Convertible Preferred Stock" (the "Series A Preferred Stock") out of the total authorized number of 25,000,000 shares of Universal's preferred stock.

32.    On February 17, 2006, under the Purchase Agreement. Universal sold and issued 20.204 shares of the Series A Preferred stock, with each share initially convertible into 1,000 shares of Universal's common stock, $.01 par value per share (the "Common Stock"). and related warrants the "Warrants," in exchange for aggregate gross proceeds of $20,204,000.

33.    The Warrant gave the holder the right to acquire one share of Common Stock for every two shares of Common Stock initially underlying the shares of Series A Preferred Stock purchased. The Warrants were exercisable

11

initially at $0.70 per share of Common Stock, subject to adjustment, for five years.

34.    In the "Representations and Warranties of the Company" section of Universal's February 15, 2006 8-K relating to the Purchase Agreement and in comparable or identical language in the Securities Purchase Agreement, Martin made a number of false, misleading, or otherwise incorrect statements, including the following:

a.  (k) <u>SEC Documents: Financial Statements.</u>  "During the two (2) years prior to the date hereof, the Company has filed all reports, schedules, forms, statements and other documents required to be filed with the SEC pursuant to the reporting requirements of the 1934 Act ... As of their respective dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order t5o make the statements therein, in the light of the circumstances under which they were made, not misleading." ...

b.  (l) <u>Absence of Certain Changes.</u>  "Except as disclosed in Section 3(l), since the date of the Company's most recent financial statements contained in a Form 10-QSB, there has been no material adverse change and no material adverse development in the business, assets, properties, operations, condition (financial or otherwise), results of operations or prospects of the Company." ...

c.  (m)  <u>No Undisclosed Events, Liabilities, Developments or Circumstances.</u>  "No event, liability, development or circumstances has occurred or exists, or is contemplated to occur with respect to the Company, its Subsidiaries or their respective business, properties, prospects, operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws on a registration statement on Form S-1 filed with the SEC relating to an issuance and sale by the Company of its Common Stock and which has not been publicly announced."

d. (n) <u>Conduct of Business: Regulatory Permits</u>.    "Neither the Company nor its Subsidiaries is in violation of any term of or in default under its preferred stock of the Company or Bylaws or their organizational charter or certificate of incorporation or bylaws, respectively ... the Company is not in violation of any of the rules, regulations or requirements of the Principal Market and has no knowledge of any facts or circumstances that would reasonably lead to delisting or suspension of the Common Stock by the Principal Market in the foreseeable future."

e. (q) <u>Transaction With Affiliates</u>.    "...none of the officers, directors or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries ... including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property from, or otherwise requiring payments to or from any such officer, director or employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any such officer, director, or employee has a substantial interest or is an officer, director, trustee or partner."

f. (cc) <u>Internal Accounting and Disclosure Controls</u>.    "The Company maintains a system of internal accounting controls sufficient to provide reasonable assurance ... The Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-14a under the 1934 Act) that are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported ... to allow timely decisions regarding required disclosure."

g. (gg) <u>Manipulation of Price</u>.    "The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) other than the Agent, sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) other than the Agent, paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company."

h. (ii) <u>Disclosure</u>.    "...All disclosure provided to the Buyers regarding the Company ... is true and correct and does not contain any untrue statement of material fact or omit to state any material fact necessary in order to make the statements made therein, in the

light of the circumstances under which they were made, not misleading. Each press release issued by the Company during the twelve (12) months preceding the date of this Agreement did not at the time of release contain any untrue statement of material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading. No event or circumstance has occurred or information exists with respect to the Company or any of its Subsidiaries or its or their business, properties, prospects, operations or financial conditions, which, under applicable law, rule or regulation, requires public disclosure or announcement by the company but which has not been so publicly announced or disclosed."

35.     Martin knew or was reckless in not knowing that the information contained in the "Representations and Warranties of the Company" section of Universal's February 15, 2006 8-K and of the Securities Purchase Agreement was false, misleading, or otherwise incorrect, and failed to do anything to correct it.

36.     In the "Covenants" section of Universal's February 15, 2006 8-K and in the Securities Purchase Agreement, Martin made yet another false, misleading, or otherwise incorrect statement relating to the use of proceeds from the February 17, 2006 stock sale. Section 4(d) under "Covenants" states that:

> "The Company will use the proceeds from the sale of the Securities as set forth on Schedule 4(d) and not for, except as specifically set forth on Schedule 4(d), (A) repayment of any outstanding Indebtedness of the Company or any of its Subsidiaries or (B) redemption or repurchase of any of its or its Subsidiaries' equity securities."

37.     Martin knew or was reckless in not knowing that the information contained in the "Covenants" section of Universal's February 15, 2006 8-K was false, misleading, or otherwise incorrect, and failed to do anything to correct it.

38.    After the fraudulent and improper sale of stock. Defendants Martin, Levy, and Fry fraudulently and improperly used funds from the February 17. 2006 sale. along with other company funds. for personal use. Defendants Martin, Levy, and Fry continued to misrepresent and omit facts concerning the use of the sale proceeds and the financial condition of Universal.

**Misuse of Corporate Funds**

39.    Almost simultaneously with the implementation of the Securities Purchase Agreement, Defendant Martin began to misuse corporate funds through various improper payments and other transfers.

40.    Martin used funds raised in the offering of Series A Preferred Stock to benefit the First Midland States Bank in Effingham. Illinois which had contacts going back to Martin's father and his personal businesses.

41.    In addition to working for Universal. Duane Martin owned two Sav-A-Lot Stores in Morris and Plano Illinois. Martin also used Midland States Bank in Effingham Illinois as the corporate bank for the Sav-A-Lot stores.   On or about January 3. 2006. just prior to the offering of the Series A Preferred Stock. Martin caused $75,000 to be wired directly from Universal's account to Supervalu (parent of Sav-A-Lot). Martin justified the transaction by referencing it as a "Slotting Fees for USFB product." Martin wired or otherwise transferred money to his Sav-A-Lot stores directly from Universal's corporate accounts at First Midland States Bank and later at Harris Bank.  Martin used Universal to pay expenses of his Save-A-Lot stores by instructing Universal's accountants to

issue checks in January and February of 2006 to pay over $125.000 in Save-A-Lot expenses.

42.    From August 12, 2005 until at least May 5, 2006. Martin continued to debit Universal's bank accounts and credit the account of his Sav-A-Lot stores and other accounts controlled by him, thereby causing Universal to fund operations of his personal business. The following is a graph outlining the Martin's various debits of Universal's accounts and the corresponding credits to those same accounts:

| Date | Account Description | Transaction Description | Debit Amount | Credit Amount |
|------|---------------------|------------------------|--------------|---------------|
| 8/12/05 | Midland States Bank Operating | Transfer to DNM Morris | | $1.059.00 |
| 8/15/05 | | Transfer from DNM Morris | $1.059.00 | |
| 8/18/05 | Midland States Bank Operating | Transfer to DNM Morris | | $10.413.26 |
| 8/19/05 | | Transfer from DNM Morris | $10.413.26 | |
| 9/1/05 | Midland States Bank Operating | Transfer to DNM Morris | | $7.364.90 |
| 9/2/05 | | Transfer from DNM Morris | $7.364.90 | |
| 9/8/05 | Midland States Bank Operating | Transfer to DNM Morris | | $2.154.17 |
| 9/8/05 | | Transfer from DNM Morris | $2.154.17 | |
| 1/17/06 | Midland States Bank Operating | Transfer to DNM Morris | | $10.856.99 |
| 1/18/06 | | Transfer from DNM Morris | $10,856.99 | |
| 1/11/06 | Midland States Bank | Transfer to DNM | | $18.686.13 |

| | Operating | | | |
| 1/12/06 | | Transfer from DNM | $18.686.13 | |
| 1/23/06 | Midland States Bank Operating | Transfer to DNM | | $43.777.47 |
| 1/24/06 | | Transfer from DNM | $43.777.47 | |
| 2/27/06 | Midland States Bank Operating | Duane Martin | | $46.471.69 |
| 3/1/06 | | Bank Deposit 3/1/06. Repayment of Wire from February | $46.471.69 | |
| 3/21/06 | Midland States Bank Operating | Duane Martin | | $44.076.55 |
| 3/30/06 | | Duane Martin | | $49,561.50 |
| 5/5/06 | | Deposit 2 checks from DNM | $93.638.05 | |

Martin blamed the majority of these transactions on "bank errors." but later admitted taking money, stating that it was to cover Sav-A-Lot expenses.

43.    From Universal's inception. Martin flew private jets for both personal and business travel.  Between June of 2005 and May of 2006. Martin improperly charged Universal for approximately $490,000 for personal aviation expenses.

44.    Martin also caused Universal's accounting department to improperly issue other checks directly to him personally for purported "expenses" and "salary."  On January 3, 2006, Martin instructed Universal's accounting department to issue a check in the amount of $50,000 directly to

17

him personally and an additional wire transfer was made to Martin's personal account in the amount of $150,000. Martin never provided any expense reports of other back-up to justify the $200,000 payments. On or about March 1, 2006, Martin instructed Universal's accounting department to wire, him personally, $240,705.23, despite the fact that Martin's contract only called for him to make $125,000 until such time as Universal's sales hit $4,000,000. On March 3, 2006 upon Martin's direction, Universal wired $15,979.28 to Duane Martin's personal account. Additional improper wire transfers were made directly to Martin's personal bank account on March 23, 2006 and again on April 4, 2006 in the amounts of $8,015.00 and $4,000 respectively.

45.    Martin also instructed Universal's accountants to pay personal expenses that were not included in Martin's employment contract. On April 21, 2006, Martin also used Universal funds to pay his personal attorney Robert N. Wadington $75,020.00 despite the fact that Universal's General Counsel was not aware of any work Wadington had ever performed for Universal.

46.    Martin resigned his position as the Chief Executive Officer of Universal at a meeting of the Board of Directors on June 1, 2006. By letter dated June 6, 2006, Martin resigned his position as a Director as well.

47.    Fry resigned his position as President of Universal by Agreement dated August 9, 2006 and agreed to step down as an employee of Universal as of December 31, 2006. From August 2, 2006 to December 31, 2006, Fry was treated as an employee of the company on administrative leave.

## V. PLAINTIFFS' CLASS ACTION ALLEGATIONS

48.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or acquired preferred stock issued by Universal on or about February 16, 2006 (the "Class Period") in an offering in which approximately $20 million of this preferred stock was sold. Excluded from the Class are Defendants and members of their immediate families and their legal representatives, heirs, successors, or assigns.

49.     The members of the Class are so numerous that joinder of all members is impracticable. In the Class Period, fourteen persons or entities purchased Series A Preferred Stock of Universal who may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

50.     Plaintiffs' claims are typical of the claims of the members of the Class because all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.

51.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are the following:

(a)    whether Defendants' actions as alleged herein violated the federal securities laws;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, prospects, operations, and management of Universal; and

(c)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

53.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action.

**No Safe Harbor**

54.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that

20

the particular forward-looking statement was false, or the forward-looking statement was authorized or approved by them in their capacity as officers and directors of Universal and they knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

55.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

56.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and throughout the Class Period did (a) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein, and (b) cause Plaintiffs and the other members of the Class to purchase Universal's securities at artificially inflated prices. In furtherance of the unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

57.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of Universal's Series A Preferred Stock in an effort to maintain artificially high market prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58.　　Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Universal's financial well-being, business relationships, and prospects, as specified herein.

59.　　Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Universal's value, performance, and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Universal and its business operations and future prospects not misleading in light of the circumstances under which they were made, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit on the purchasers of Universal's Series A Preferred Stock during the Class Period.

60.　　Defendant's primary liability and controlling person liability arises from the following facts: (a) prior to, during and after the Class Period, Defendants were high-level executives and directors at Universal and were members of the Company's management team or had control thereof; (b) Defendants, by virtue of their responsibilities and activities as officers and

directors of the Company were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and reports; (c) Defendants enjoyed significant personal contact and access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) Defendants were aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

61.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose of concealing Universal's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

62.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth

herein, the market price of Universal securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Universal's Series A Preferred Stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which Universal's securities traded, or in the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Universal's Series A Preferred Stock at artificially inflated prices and were damaged thereby.

63.     At the time of the misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Universal's financial condition and prospects, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Universal Series A Preferred Stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

64.     Based on the allegations contained herein, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection

with their purchases of Universal's Series A Preferred Stock during the Class Period.

66.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

67.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

68.    Defendants acted as controlling persons of Universal within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in or awareness of the Company's operations, and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after those statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.    In particular. Defendants had direct and supervisory involvement in the day-to-day operations of the Company and. therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

70.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as a controlling person. Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Universal's Series A Preferred Stock during the Class Period.

71.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

(a)    A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants. jointly and severally. for all damages sustained as a result of Defendants' wrongdoing. in an amount to be proven at trial, including interest thereon:

(c)    An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

| Dated: June 5, 2008 | **TOUHY, TOUHY, BUEHLER & WILLIAMS** |
|---|---|
|  | s/ Robert E. Williams |
|  | Terrence Buehler<br>Robert E. Williams<br>161 N. Clark Street. Suite 2210<br>Chicago, Illinois 60601<br>Telephone: (312) 372-2209<br>Facsimile: (312) 456-3838 |

CERTIFICATION OF PROPOSED LEAD PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

Crestview Capital Master, L.L.C. ("Crestview") declares the following under penalties of perjury:

1.    My name is Bob Felsenthal and I am authorized to make these assertions on behalf of Crestview.

2.    I have reviewed and authorized the filing of the Complaint in this action.

3.    Crestview has authorized Touhy, Touhy, Buehler & Williams ("TTBW") to commence litigation against any defendants as may be appropriate, and has retained TTBW as counsel for it in this action for all purposes.

4.    Crestview did not acquire Universal Food & Beverage Company, Inc. ("Universal") preferred stock at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

5.    Crestview is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

6.    Crestview will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses directly related to the class representation, as ordered or approved by the court pursuant to law.

7.    Crestview has not served or sought to serve as a representative party for a class in an action under the federal securities laws within the past three years.

8.    On or about February 16, 2006, Crestview completed the following transaction in Universal Series A Preferred Stock and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 3,000 (with 3,000,000 warrants) | Buy | 2/16/06 | $1,000 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

        No other purchases or sales of any Universal securities were made during the Class Period in any accounts in which Crestview has a beneficial interest.

Crestview declares under penalty of perjury that the foregoing is true and correct.

Executed this ___5ᵗʰ___ of ___June___, 2008

Stewart Flink
Crestview Capital Master, L.L.C.

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

MidSummer Investment, Ltd. ("Midsummer") declares the following under penalties of perjury:

1.  My name is Josh Thomas and I am authorized to make these assertions on behalf of MidSummer.

2.  I have reviewed and authorized the filing of the Complaint in this action.

3.  MidSummer has authorized Touhy, Touhy, Buehler & Williams ("TTBW") to commence litigation against any defendants as may be appropriate, and has retained TTBW as counsel for it in this action for all purposes.

4.  MidSummer did not acquire Universal Food & Beverage Company, Inc. ("Universal") preferred stock at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

5.  MidSummer is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

6.  MidSummer will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses directly related to the class representation, as ordered or approved by the court pursuant to law.

7.  MidSummer has not served or sought to serve as a representative party for a class in an action under the federal securities laws within the past three years.

8.  On or about February 16, 2006, MidSummer completed the following transaction in Universal Series A Preferred Stock and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 3,000 (with 3,000,000 warrants) | Buy | 2/16/06 | $1,000 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

No other purchases or sales of any Universal securities were made during the Class Period in any accounts in which Midsummer has a beneficial interest.

MidSummer declares under penalty of perjury that the foregoing is true and correct.

Executed this 5th of June , 2008

Josh Thomas, MidSummer Investment, Ltd.
Midsummer Capital, LLC
Acting as Investment Manager for
Midsummer Investment, Ltd.

**EXHIBIT A**

## SECURITIES PURCHASE AGREEMENT

**SECURITIES PURCHASE AGREEMENT** (the "**Agreement**"), dated as of February 15, 2006, by and among Universal Food & Beverage Company, a Nevada corporation, with headquarters located at 3830 Commerce Drive, St. Charles, Illinois 60174 (the "**Company**"), and the investors listed on the Schedule of Buyers attached hereto (individually, a "**Buyer**" and collectively, the "**Buyers**").

**WHEREAS**:

A.      The Company and each Buyer is executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(2) of the Securities Act of 1933, as amended (the "**1933 Act**"), and Rule 506 of Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**SEC**") under the 1933 Act.

B.      The Company has authorized a new series of convertible preferred shares of the Company designated as Series A Convertible Preferred Stock, the terms of which are set forth in the certificate of designations for such series of preferred shares (the "**Certificate of Designations**") in the form attached hereto as <u>Exhibit A</u> (together with any convertible preferred shares issued in replacement thereof in accordance with the terms thereof, the "**Preferred Shares**"), which Preferred Shares shall be convertible into the Company's common stock, $0.01 par value per share (the "**Common Stock**"), in accordance with the terms of the Certificate of Designations.

C.      Each Buyer wishes to purchase, and the Company wishes to sell, upon the terms and conditions stated in this Agreement, (i) that aggregate number of Preferred Shares set forth opposite such Buyer's name in column (3) on the Schedule of Buyers (which aggregate number for all Buyers shall be 20,704 (as converted, collectively, the "**Conversion Shares**") and (ii) Warrants in substantially the form attached hereto as <u>Exhibit B</u> (the "**Warrants**"), to acquire that number of shares of Common Stock (as exercised, collectively, the "**Warrant Shares**") set forth opposite such Buyer's name in column (4) on the Schedule of Buyers.

D.      The Preferred Shares may be entitled to dividends, which at the option of the Company, subject to certain conditions, may be paid in shares of Common Stock (the "**Dividend Shares**").

E.      Contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering a Registration Rights Agreement, substantially in the form attached hereto as <u>Exhibit C</u> (the "**Registration Rights Agreement**"), pursuant to which the Company has agreed to provide certain registration rights with respect to the Registrable Securities (as defined in the Registration Rights Agreement) under the 1933 Act and the rules and regulations promulgated thereunder, and applicable state securities laws.

F.      The Preferred Shares, the Conversion Shares, the Dividend Shares, the Warrants and the Warrant Shares are collectively are referred to herein as the "**Securities**".

10050698.14

G.    The Company will consummate, contemporaneously with the Closing, the transactions contemplated by the Savannah Purchase Agreement (as defined below).

**NOW, THEREFORE**, the Company and each Buyer hereby agree as follows:

1.    PURCHASE AND SALE OF PREFERRED SHARES AND WARRANTS.

(a)    <u>Preferred Shares and Warrants</u>.  Subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 below, the Company shall issue and sell to each Buyer, and each Buyer severally, but not jointly, agrees to purchase from the Company on the Closing Date (as defined below), the number of Preferred Shares as is set forth opposite such Buyer's name in column (3) on the Schedule of Buyers, along with Warrants to acquire that number of Warrant Shares as is set forth opposite such Buyer's name in column (4) on the Schedule of Buyers.

(b)    <u>Closing</u>.  The closing (the **"Closing"**) of the purchase of the Preferred Shares and the Warrants by the Buyers shall occur at the offices of Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022.  The date and time of the Closing (the **"Closing Date"**) shall be 10:00 a.m., New York City Time, on the date hereof, subject to notification of satisfaction (or waiver) of the conditions to the Closing set forth in Sections 6 and 7 below (or such later date as is mutually agreed to by the Company and each Buyer).

(c)    <u>Purchase Price</u>.  The aggregate purchase price for the Preferred Shares and the Warrants to be purchased by each Buyer (the **"Purchase Price"**) shall be the amount set forth opposite such Buyer's name in column (5) on the Schedule of Buyers.  Each Buyer shall pay $1,000 for each Preferred Share and related Warrants to be purchased by such Buyer at the Closing.

(d)    <u>Form of Payment</u>.  On the Closing Date, (A) each Buyer shall pay its portion of the Purchase Price to the Company for the Preferred Shares and the Warrants to be issued and sold to such Buyer at the Closing, (i) by wire transfer of immediately available funds in accordance with the Company's written wire instructions or (ii) by exchange of the Exchangeable Notes (as defined below) pursuant to the terms thereof, and (B) the Company shall deliver to each Buyer the number of Preferred Shares as is set forth opposite such Buyer's name in column (3) on the Schedule of Buyers, along with the Warrants exercisable for the number of shares of Common Stock as is set forth opposite such Buyer's name in column (4) on the Schedule of Buyers, each duly executed on behalf of the Company and registered in the name of such Buyer or its designee.

2.    **BUYER'S REPRESENTATIONS AND WARRANTIES.**

Each Buyer represents and warrants with respect to only itself that:

(a)    <u>Organization; Authority</u>.  Such Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with the requisite power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents (as defined below) to which it is a party and otherwise to carry out its obligations hereunder and thereunder.

(b)    No Public Sale or Distribution. Such Buyer (i) is acquiring the Preferred Shares and the Warrants (ii) upon conversion of the Preferred Shares will acquire the Conversion Shares and (ii) upon exercise of the Warrants will acquire the Warrant Shares, in each case, for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the 1933 Act; provided, however, that by making the representations herein, such Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act. Such Buyer is acquiring the Securities hereunder in the ordinary course of its business. Such Buyer does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

(c)    Accredited Investor Status. Such Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D.

(d)    Reliance on Exemptions. Such Buyer understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and such Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of such Buyer to acquire the Securities.

(e)    Information. Such Buyer and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by such Buyer. Such Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company. Neither such inquiries nor any other due diligence investigations conducted by such Buyer or its advisors, if any, or its representatives shall modify, amend or affect such Buyer's right to rely on the Company's representations and warranties contained herein. Such Buyer understands that its investment in the Securities involves a high degree of risk. Such Buyer has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of the Securities.

(f)    No Governmental Review. Such Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(g)    Transfer or Resale. Such Buyer understands that except as provided in the Registration Rights Agreement: (i) the Securities have not been and are not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder, (B) such Buyer shall have delivered to the Company an opinion of counsel, by counsel reasonably acceptable to the Company and in form and substance reasonably satisfactory to the Company, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption

from such registration, or (C) such Buyer provides the Company with reasonable assurance that such Securities can be sold, assigned or transferred pursuant to Rule 144 or Rule 144A promulgated under the 1933 Act, as amended, (or a successor rule thereto) (collectively, "**Rule 144**"); (ii) any sale of the Securities made in reliance on Rule 144 may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of the Securities under circumstances in which the seller (or the Person (as defined in Section 3(s)) through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other Person is under any obligation to register the Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder. The Securities may be pledged pursuant to an available exemption from registration under the 1933 Act in connection with a bona fide margin account or other loan or financing arrangement secured by the Securities and such pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and no Buyer effecting a pledge of Securities shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document (as defined in Section 3(b)), including, without limitation. this Section 2(g).

        (h)    <u>Legends</u>.    Such Buyer understands that the certificates or other instruments representing the Preferred Shares and the Warrants and, until such time as the resale of the Conversion Shares and the Warrant Shares have been registered under the 1933 Act as contemplated by the Registration Rights Agreement, the stock certificates representing the Conversion Shares and the Warrant Shares, except as set forth below, shall bear any legend as required by the "blue sky" laws of any state and a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such stock certificates):

[NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE] [EXERCISABLE] HAVE BEEN][THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN] REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS. OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM. THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR (II) UNLESS SOLD PURSUANT TO RULE 144(K) UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING. THE SECURITIES MAY BE PLEDGED PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of the Securities upon which it is stamped, if, unless otherwise required by state securities laws, (i) such Securities are registered for resale under the 1933 Act, (ii) in connection with a sale, assignment or other transfer, such holder provides the Company with an opinion of counsel, by counsel reasonably acceptable to the Company and in form and substance reasonably satisfactory to the Company, to the effect that such sale, assignment or transfer of the Securities may be made without registration under the applicable requirements of the 1933 Act, or (iii) such holder provides the Company with reasonable assurance that the Securities can be sold, assigned or transferred pursuant to Rule 144(k).

(i)     Validity; Enforcement.  This Agreement and the Registration Rights Agreement to which such Buyer is a party have been duly and validly authorized, executed and delivered on behalf of such Buyer and shall constitute the legal, valid and binding obligations of such Buyer enforceable against such Buyer in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(j)     No Conflicts.  The execution, delivery and performance by such Buyer of this Agreement and the Registration Rights Agreement to which such Buyer is a party and the consummation by such Buyer of the transactions contemplated hereby and thereby will not (i) result in a violation of the organizational documents of such Buyer or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which such Buyer is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws) applicable to such Buyer, except in the case of clauses (ii) and (iii) above, for such conflicts, defaults, rights or violations which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Buyer to perform its obligations hereunder.

(k)     Residency.  Such Buyer is a resident of that jurisdiction specified below its address on the Schedule of Buyers.

3.     REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to each of the Buyers that:

(a)     Organization and Qualification.  The Company and its **"Subsidiaries"** (which for purposes of this Agreement means any entity in which the Company, directly or indirectly, owns capital stock or holds an equity or similar interest) are entities duly organized and validly existing in good standing under the laws of the jurisdiction in which they are formed, and have the requisite power and authorization to own their properties and to carry on their business as now being conducted.  Each of the Company and its Subsidiaries is duly qualified as a foreign entity to do business and is in good standing in every jurisdiction in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not

have a Material Adverse Effect. As used in this Agreement, "**Material Adverse Effect**" means any material adverse effect on the business, properties, assets, operations, results of operations, condition (financial or otherwise) or prospects of the Company and its Subsidiaries, taken as a whole, or on the transactions contemplated hereby and by the other Transaction Documents or by the agreements and instruments to be entered into in connection herewith or therewith, or on the authority or ability of the Company to perform its obligations under the Transaction Documents. The Company has no Subsidiaries. except as set forth on Schedule 3(a).

(b)     Authorization; Enforcement; Validity.   The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement, the Certificate of Designations, the Warrants. the Registration Rights Agreement, the Irrevocable Transfer Agent Instructions (as defined in Section 5(b)), and each of the other agreements entered into by the parties hereto in connection with the transactions contemplated by this Agreement (collectively, the "**Transaction Documents**") and to issue the Securities in accordance with the terms hereof and thereof. The execution and delivery of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby. including. without limitation, the issuance of the Preferred Shares, the reservation for issuance and the issuance of the Conversion Shares issuable upon conversion of the Preferred Shares. the reservation for issuance and the issuance of the Dividend Shares issuable with respect to the Preferred Shares, the issuance of the Warrants and the reservation for issuance and issuance of the Warrant Shares issuable upon exercise of the Warrants. have been duly authorized by the Company's Board of Directors and (other than the filing with the SEC of one or more Registration Statements in accordance with the requirements of the Registration Rights Agreement and any other filings as may be required by any state securities agencies) no further filing. consent. or authorization is required by the Company, its Board of Directors or its stockholders. This Agreement and the other Transaction Documents of even date herewith have been duly executed and delivered by the Company, and constitute the legal, valid and binding obligations of the Company. enforceable against the Company in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy. insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies and except as rights to indemnification and to contribution may be limited by federal or state securities law. The Certificate of Designations in the form attached hereto as Exhibit A has been filed with the Secretary of State of the State of Nevada and is in full force and effect, enforceable against the Company in accordance with its terms and has not been amended.

(c)     Issuance of Securities.   The issuance of the Preferred Shares and the Warrants are duly authorized and upon issuance in accordance with the terms of the Transaction Documents shall be free from all taxes, liens and charges with respect to the issue thereof, and the Preferred Shares shall be entitled to the rights and preferences set forth in the Certificate of Designations. As of the Closing. the Company shall have reserved from its duly authorized capital stock not less than all of its available authorized shares of Common Stock not otherwise reserved for issuance. and shall. on the Business Day immediately following the earlier of the Stockholder Approval and the Stockholder Approval Deadline, authorize and reserve for issuance such additional shares of Common Stock such that there shall be reserved from the Company's capital stock not less than the sum of (i) 125% of the maximum number of shares of

Common Stock issuable upon conversion of the Preferred Shares (assuming for purposes hereof, that the Preferred Shares are convertible at the Conversion Price and without taking into account any limitations on the conversion of the Preferred Shares set forth in the Certificate of Designations), (ii) 125% of the maximum number of shares of Common Stock issuable upon exercise of the Warrants (without taking into account any limitations on the exercise of the Warrants set forth in the Warrants) and (iii) 100% of the maximum number of shares of Common Stock issuable as Dividend Shares with respect to the Preferred Shares as of the Trading Day immediately prior to the applicable date of determination. Upon issuance or conversion in accordance with the Certificate of Designations or exercise in accordance with the Warrants, as the case may be, the Conversion Shares, the Dividend Shares and the Warrant Shares, respectively, will be validly issued, fully paid and nonassessable and free from all preemptive or similar rights, taxes, liens and charges with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Common Stock. Subject to the representations and warranties of the Buyers in this Agreement, the offer and issuance by the Company of the Securities is exempt from registration under the 1933 Act.

(d)    No Conflicts. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance of the Preferred Shares, the Warrants, and reservation for issuance of the Conversion Shares, the Warrant Shares and the Dividend Shares) will not (i) result in a violation of the Certificate of Incorporation (as defined in Section 3(r)) of the Company or any of its Subsidiaries or the Certificate of Designations of the Company, or the Bylaws (as defined in Section 3(r)) or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and the rules and regulations of the OTC Bulletin Board (the "**Principal Market**") applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected except, in the case of clause (ii) or (iii) above, to the extent such conflict, default, termination right or violation would not reasonably be expected to have a Material Adverse Effect.

(e)    Consents. Except as set forth in Schedule 3(e), the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or any other Person in order for it to execute, deliver or perform any of its obligations under or contemplated by the Transaction Documents, in each case in accordance with the terms hereof or thereof. All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the Closing Date, and the Company and its Subsidiaries are unaware of any facts or circumstances which might prevent the Company from obtaining or effecting any of the registration, application or filings pursuant to the preceding sentence. The Company is not in violation of the requirements of the Principal Market and has no knowledge of any facts which would reasonably lead to delisting or suspension of the Common Stock in the foreseeable future.

(f)     Acknowledgment Regarding Buyer's Purchase of Securities.  The Company acknowledges and agrees that each Buyer is acting solely in the capacity of arm's length purchaser with respect to the Transaction Documents and the transactions contemplated hereby and thereby and that no Buyer is (i) an officer or director of the Company, (ii) an "affiliate" of the Company (as defined in Rule 144) or (iii) to the knowledge of the Company, a "beneficial owner" of more than 10% of the shares of Common Stock (as defined for purposes of Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "**1934 Act**")).  The Company further acknowledges that no Buyer is acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated hereby and thereby, and any advice given by a Buyer or any of its representatives or agents in connection with the Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to such Buyer's purchase of the Securities. The Company further represents to each Buyer that the Company's decision to enter into the Transaction Documents has been based solely on the independent evaluation by the Company and its representatives.

(g)     No General Solicitation; Placement Agent's Fees.  Neither the Company, nor any of its affiliates, nor any Person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Securities.  The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or brokers' commissions (other than for persons engaged by any Buyer or its investment advisor) relating to or arising out of the transactions contemplated hereby.  The Company shall pay, and hold each Buyer harmless against, any liability, loss or expense (including, without limitation, attorney's fees and out-of-pocket expenses) arising in connection with any such claim.  The Company acknowledges that it has engaged Illington Capital Inc. as placement agent (the "**Agent**") in connection with the sale of the Securities.  Other than the Agent, the Company has not engaged any placement agent or other agent in connection with the sale of the Securities.

(h)     No Integrated Offering.  None of the Company, its Subsidiaries, any of their affiliates, and any Person acting on their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of any of the Securities under the 1933 Act or cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of any exchange or automated quotation system on which any of the securities of the Company are listed or designated.  None of the Company, its Subsidiaries, their affiliates and any Person acting on their behalf will take any action or steps referred to in the preceding sentence that would require registration of any of the Securities under the 1933 Act or cause the offering of the Securities to be integrated with other offerings.

(i)     Dilutive Effect.  The Company understands and acknowledges that the number of Conversion Shares issuable upon conversion of the Preferred Shares, the number of Dividend Shares issuable with respect to the Preferred Shares and the Warrant Shares issuable upon exercise of the Warrants, will increase in certain circumstances.  The Company further acknowledges that its obligation to issue Conversion Shares upon conversion of the Preferred Shares in accordance with this Agreement and the Certificate of Designations and its obligation

to issue the Warrant Shares upon exercise of the Warrants in accordance with this Agreement and the Warrants is, in each case, absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other stockholders of the Company.

(j)    Application of Takeover Protections; Rights Agreement.    The Company and its Board of Directors have taken all necessary action, if any, in order to render inapplicable any poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision which is or could become applicable to any Buyer as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and any Buyer's ownership of the Securities. The Company has not adopted a stockholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change in control of the Company.

(k)    SEC Documents; Financial Statements.    During the two (2) years prior to the date hereof, the Company has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the 1934 Act (all of the foregoing filed prior to the date hereof and all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "**SEC Documents**"). The Company has delivered to the Buyers or their respective representatives true, correct and complete copies of each of the SEC Documents not available on the EDGAR system that have been requested by each Buyer. As of their respective dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. As of their respective dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto as in effect as of the time of filing. Such financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied, during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

(l)    Absence of Certain Changes.    Except as disclosed in Section 3(l), since the date of the Company's most recent financial statements contained in a Form 10-QSB, there has been no material adverse change and no material adverse development in the business, assets, properties, operations, condition (financial or otherwise), results of operations or prospects of the Company.    Except as disclosed in Schedule 3(l), since the date of the Company's most recent financials statements contained in a Form 10-QSB, the Company has not (i) declared or paid any dividends, (ii) sold any assets, individually or in the aggregate, in excess of $50,000 outside of the ordinary course of business or (iii) had capital expenditures, individually or in the aggregate, in excess of $50,000. The Company has not taken any steps to seek protection pursuant to any

bankruptcy law nor does the Company have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy proceedings or any actual knowledge of any fact which would reasonably lead a creditor to do so. The Company is not as of the date hereof, and after giving effect to the transactions contemplated hereby to occur at the Closing, will not be Insolvent (as defined below). For purposes of this Section 3(l), **"Insolvent"** means (i) the present fair saleable value of the Company's assets is less than the amount required to pay the Company's total Indebtedness (as defined in Section 3(s)), (ii) the Company is unable to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, (iii) the Company intends to incur or believes that it will incur debts that would be beyond its ability to pay as such debts mature or (iv) the Company has unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted.

(m)     No Undisclosed Events, Liabilities, Developments or Circumstances. No event, liability, development or circumstance has occurred or exists, or is contemplated to occur with respect to the Company, its Subsidiaries or their respective business, properties, prospects, operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws on a registration statement on Form S-1 filed with the SEC relating to an issuance and sale by the Company of its Common Stock and which has not been publicly announced.

(n)     Conduct of Business; Regulatory Permits. Neither the Company nor its Subsidiaries is in violation of any term of or in default under its Certificate of Incorporation, the Certificate of Designations, any other certificate of designation, preferences or rights of any other outstanding series of preferred stock of the Company or Bylaws or their organizational charter or certificate of incorporation or bylaws, respectively. Neither the Company nor any of its Subsidiaries is in violation of any judgment, decree or order or any statute, ordinance, rule or regulation applicable to the Company or its Subsidiaries, and neither the Company nor any of its Subsidiaries will conduct its business in violation of any of the foregoing, except in all cases for possible violations which would not, individually or in the aggregate, have a Material Adverse Effect. Without limiting the generality of the foregoing, the Company is not in violation of any of the rules, regulations or requirements of the Principal Market and has no knowledge of any facts or circumstances that would reasonably lead to delisting or suspension of the Common Stock by the Principal Market in the foreseeable future. During the two (2) years prior to the date hereof, (i) the Common Stock has been designated for quotation on the Principal Market, (ii) trading in the Common Stock has not been suspended by the SEC or the Principal Market and (iii) the Company has received no communication, written or oral, from the SEC or the Principal Market regarding the suspension or delisting of the Common Stock from the Principal Market. The Company and its Subsidiaries possess all certificates, authorizations and permits issued by the appropriate regulatory authorities necessary to conduct their respective businesses, except where the failure to possess such certificates, authorizations or permits would not have, individually or in the aggregate, a Material Adverse Effect, and neither the Company nor any such Subsidiary has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

(o)     Foreign Corrupt Practices. Neither the Company nor any of its Subsidiaries nor any director, officer, agent, employee or other Person acting on behalf of the

Company or any of its Subsidiaries has. in the course of its actions for, or on behalf of, the Company (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

(p)     Sarbanes-Oxley Act.  The Company is in compliance with any and all applicable requirements of the Sarbanes-Oxley Act of 2002 that are effective as of the date hereof. and any and all applicable rules and regulations promulgated by the SEC thereunder that are effective as of the date hereof, except where such noncompliance would not have, individually or in the aggregate. a Material Adverse Effect.

(q)     Transactions With Affiliates.  Except as set forth in the SEC Documents filed at least ten days prior to the date hereof and other than disclosed on Schedule 3(q), none of the officers, directors or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries (other than for ordinary course services as employees, officers or directors), including any contract. agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such officer. director or employee or, to the knowledge of the Company, any corporation. partnership. trust or other entity in which any such officer. director, or employee has a substantial interest or is an officer, director, trustee or partner.

(r)     Equity Capitalization.  As of the date hereof, the authorized capital stock of the Company consists of (i) 100.000.000 shares of Common Stock and (ii) 25,000,000 shares of preferred stock. $0.01 par value.  As of the date of this Agreement. the capitalization of the Company is as set forth on Schedule 3(r) to this Agreement, which is specifically incorporated herein by this reference. Other than as set forth in Schedule 3(r) to this Agreement, there are no other shares of capital stock of the Company issued, outstanding or reserved for issuance pursuant to securities (other than the Preferred Shares and the Warrants) exercisable or exchangeable for, or convertible into, shares of Common Stock. All of such outstanding shares have been. or upon issuance will be. validly issued and are fully paid and nonassessable.  Except as disclosed in Schedule 3(r): (i) none of the Company's share capital is subject to preemptive rights or any other similar rights or any liens or encumbrances suffered or permitted by the Company; (ii) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for. any share capital of the Company or any of its Subsidiaries, or contracts. commitments. understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional share capital of the Company or any of its Subsidiaries or options. warrants. scrip. rights to subscribe to, calls or commitments of any character whatsoever relating to. or securities or rights convertible into, or exercisable or exchangeable for, any share capital of the Company or any of its Subsidiaries; (iii) there are no outstanding debt securities, notes, credit agreements, credit facilities or other agreements. documents or instruments evidencing Indebtedness of the Company or any of its Subsidiaries or by which the Company or any of its Subsidiaries is or may become bound: (iv) there are no

financing statements securing obligations in any material amounts, either singly or in the aggregate, filed in connection with the Company or any of its Subsidiaries; (v) there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of their securities under the 1933 Act (except the Registration Rights Agreement); (vi) there are no outstanding securities or instruments of the Company or any of its Subsidiaries which contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to redeem a security of the Company or any of its Subsidiaries; (vii) there are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of the Securities; (viii) the Company does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement; and (ix) the Company and its Subsidiaries have no liabilities or obligations required to be disclosed in the SEC Documents but not so disclosed in the SEC Documents, other than those incurred in the ordinary course of the Company's or its Subsidiaries' respective businesses and which, individually or in the aggregate, do not or would not have a Material Adverse Effect. The Company has furnished to the Buyer true, correct and complete copies of the Company's Certificate of Incorporation, as amended and as in effect on the date hereof (the "**Certificate of Incorporation**") and the Company's Bylaws, as amended and as in effect on the date hereof (the "**Bylaws**"), and the terms of all securities convertible into, or exercisable or exchangeable for, shares of Common Stock and the material rights of the holders thereof in respect thereto.

        (s)    <u>Indebtedness and Other Contracts</u>.  Except as set forth on <u>Schedule 3(s)</u>, neither the Company nor any of its Subsidiaries (i) has any outstanding Indebtedness (as defined below), (ii) is in violation of any term of or in default under any contract, agreement or instrument relating to any Indebtedness, except where such violations and defaults would not result, individually or in the aggregate, in a Material Adverse Effect, or (iii) is a party to any contract, agreement or instrument relating to any Indebtedness, the performance of which, in the judgment of the Company's officers, has or is expected to have a Material Adverse Effect. <u>Schedule 3(s)</u> provides a detailed description of the material terms of any such outstanding Indebtedness.  For purposes of this Agreement: (x) "**Indebtedness**" of any Person means, without duplication (A) all indebtedness for borrowed money, (B) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (including, without limitation, "capital leases" in accordance with generally accepted accounting principals) (other than trade payables entered into in the ordinary course of business), (C) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (D) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (E) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (F) all monetary obligations under any leasing or similar arrangement which, in connection with generally accepted accounting principles, consistently applied for the periods covered thereby, is classified as a capital lease, (G) all indebtedness referred to in clauses (A) through (F) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights)

owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and (H) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (A) through (C) above: (y) **"Contingent Obligation"** means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; and (z) **"Person"** means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

(t)    Absence of Litigation.    There is no action, suit, proceeding, inquiry or investigation before or by the Principal Market, any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company, threatened against or affecting the Company, the Common Stock or any of the Company's Subsidiaries or any of the Company's or its Subsidiaries' officers or directors, that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(u)    Insurance.    The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged.    Neither the Company nor any such Subsidiary has been refused any insurance coverage sought or applied for and neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

(v)    Employee Relations.    (i) Neither Company nor any of its Subsidiaries is a party to any collective bargaining agreement or employs any member of a union.    The Company and its Subsidiaries believe that their relations with their employees are good.    Except as set forth on Schedule 3(v), no executive officer of the Company or any of its Subsidiaries (as defined in Rule 501(f) of the 1933 Act) has notified the Company or any such Subsidiary that such officer intends to leave the Company or any such Subsidiary or otherwise terminate such officer's employment with the Company or any such Subsidiary.    No executive officer of the Company or any of its Subsidiaries, to the knowledge of the Company or any such Subsidiary, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement, non-competition agreement, or any other contract or agreement or any restrictive covenant, and the continued employment of each such executive officer does not subject the Company or any such Subsidiary to any liability with respect to any of the foregoing matters.

(ii)    The Company and its Subsidiaries are in compliance with all federal, state, local and foreign laws and regulations respecting labor, employment and employment practices and benefits, terms and conditions of employment and wages and hours,

except where failure to be in compliance would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(w)    Title.    Except as set forth in Schedule 3(w), the Company and its Subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and any of its Subsidiaries. Any real property and facilities held under lease by the Company and any of its Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and buildings by the Company and its Subsidiaries.

(x)    Intellectual Property Rights.    The Company and its Subsidiaries own or possess adequate rights or licenses to use all trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, governmental authorizations, trade secrets and other intellectual property rights ("Intellectual Property Rights") necessary to conduct their respective businesses as now conducted except where the failure to so own or possess would not reasonably be expected to result in a Material Adverse Effect. None of the Company's Intellectual Property Rights have expired or terminated, or are expected to expire or terminate, within three years from the date of this Agreement. The Company does not have any knowledge of any infringement by the Company or its Subsidiaries of Intellectual Property Rights of others. There is no claim, action or proceeding being made or brought, or to the knowledge of the Company, being threatened, against the Company or its Subsidiaries regarding its Intellectual Property Rights. The Company is unaware of any facts or circumstances which might give rise to any of the foregoing infringements or claims, actions or proceedings. The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties.

(y)    Environmental Laws.    The Company and its Subsidiaries (i) are in compliance with any and all Environmental Laws (as hereinafter defined), (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (iii) are in compliance with all terms and conditions of any such permit, license or approval where, in each of the foregoing clauses (i), (ii) and (iii), the failure to so comply could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. The term "Environmental Laws" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(z)    Subsidiary Rights.  The Company or one of its Subsidiaries has the unrestricted right to vote, and (subject to limitations imposed by applicable law) to receive dividends and distributions on, all capital securities of its Subsidiaries as owned by the Company or such Subsidiary.

(aa)    Investment Company Status.  The Company is not, and upon consummation of the sale of the Securities will not be, an "investment company," a company controlled by an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

(bb)    Tax Status.  The Company and each of its Subsidiaries (i) has made or filed all foreign, Canadian, federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and (iii) has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

(cc)    Internal Accounting and Disclosure Controls.  The Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset and liability accountability, (iii) access to assets or incurrence of liabilities is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets and liabilities is compared with the existing assets and liabilities at reasonable intervals and appropriate action is taken with respect to any difference.  The Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-14 under the 1934 Act) that are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the SEC, including, without limitation, controls and procedures designed in to ensure that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is accumulated and communicated to the Company's management, including its principal executive officer or officers and its principal financial officer or officers, as appropriate, to allow timely decisions regarding required disclosure.  During the twelve months prior to the date hereof neither the Company nor any of its Subsidiaries have received any notice or correspondence from any accountant relating to any potential material weakness in any part of the system of internal accounting controls of the Company or any of its Subsidiaries.

(dd)    Off Balance Sheet Arrangements.  There is no transaction, arrangement, or other relationship between the Company and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its 1934 Act filings and is not so disclosed or that otherwise would be reasonably likely to have a Material Adverse Effect.

(ee)    Transfer Taxes.  On the Closing Date, all stock transfer or other taxes (other than income or similar taxes) which are required to be paid in connection with the sale and transfer of the Securities to be sold to each Buyer hereunder will be, or will have been, fully paid or provided for by the Company, and all laws imposing such taxes will be or will have been complied with.

(ff)    Registration Eligibility.   The Company is eligible to register the Conversion Shares, the Dividend Shares and the Warrant Shares for resale by the Buyers using Form SB-2 promulgated under the 1933 Act.

(gg)    Manipulation of Price.  The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) other than the Agent, sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) other than the Agent, paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

(hh)    Acknowledgement Regarding Buyers' Trading Activity.  It is understood and acknowledged by the Company (i) that, except as set forth in Section 4(r), none of the Buyers have been asked by the Company or its Subsidiaries to agree, nor has any Buyer agreed with the Company or its Subsidiaries, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term; (ii) that any Buyer, and counter parties in "derivative" transactions to which any such Buyer is a party, directly or indirectly, presently may have a "short" position in the Common Stock, and (iii) that each Buyer shall not be deemed to have any affiliation with or control over any arm's length counter party in any "derivative" transaction. The Company further understands and acknowledges that, except as restricted by the provisions of Section 4(r), one or more Buyers may engage in hedging and/or trading activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value of the Conversion Shares and the Warrant Shares deliverable with respect to Securities are being determined and such hedging and/or trading activities, if any, can reduce the value of the existing Shareholders' equity interest in the Company both at and after the time the hedging and/or trading activities are being conducted. The Company acknowledges that, except if in violation of Section 4(r), such aforementioned hedging and/or trading activities do not constitute a breach of this Agreement, the Certificate of Designations, the Warrants or any of the documents executed in connection herewith.

(ii)    Disclosure.  Except for information that will be disclosed in a periodic report on Form 8-K to be filed in accordance with the provisions of Section 4(i), the Company confirms that neither it nor any other Person acting on its behalf has provided any of the Buyers or their agents or counsel with any information that constitutes or could reasonably be expected to constitute material, nonpublic information. The Company understands and confirms that each of the Buyers will rely on the foregoing representations in effecting transactions in securities of the Company. All disclosure provided to the Buyers regarding the Company, its business and the transactions contemplated hereby, including the Schedules to this Agreement, furnished by or on behalf of the Company is true and correct and does not contain any untrue statement of a

material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. Each press release issued by the Company during the twelve (12) months preceding the date of this Agreement did not at the time of release contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading. No event or circumstance has occurred or information exists with respect to the Company or any of its Subsidiaries or its or their business, properties, prospects, operations or financial conditions, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed.

4.    COVENANTS.

(a)    Best Efforts. Each party shall use its best efforts timely to satisfy each of the conditions to be satisfied by it as provided in Sections 6 and 7 of this Agreement.

(b)    Form D and Blue Sky. The Company agrees to file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof to each Buyer promptly after such filing. The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for or to qualify the Securities for sale to the Buyers at the Closing pursuant to this Agreement under applicable securities or "Blue Sky" laws of the states of the United States (or to obtain an exemption from such qualification), and shall provide evidence of any such action so taken to the Buyers on or prior to the Closing Date. The Company shall make all filings and reports relating to the offer and sale of the Securities required under applicable securities or "Blue Sky" laws of the states of the United States following the Closing Date.

(c)    Reporting Status. Until the date on which (i) the Investors (as defined in the Registration Rights Agreement) shall have sold all the Conversion Shares, Dividend Shares and Warrant Shares, and (ii) none of the Preferred Shares or Warrants is outstanding (the "**Reporting Period**"), the Company shall file all reports required to be filed with the SEC pursuant to the 1934 Act, and the Company shall not terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would otherwise permit such termination.

(d)    Use of Proceeds. The Company will use the proceeds from the sale of the Securities as set forth on Schedule 4(d), and not for, except as specifically set forth on Schedule 4(d), (A) repayment of any outstanding Indebtedness of the Company or any of its Subsidiaries or (B) redemption or repurchase of any of its or its Subsidiaries' equity securities.

(e)    Financial Information. The Company agrees to send the following to each Investor (as defined in the Registration Rights Agreement) during the Reporting Period (i) unless the following are filed with the SEC through EDGAR and are available to the public through the EDGAR system, within one (1) Business Day after the filing thereof with the SEC, a copy of its Annual Reports on Form 10-K or 10-KSB, any interim reports or any consolidated balance sheets, income statements, stockholders' equity statements and/or cash flow statements for any period other than annual, any Current Reports on Form 8-K and any registration statements or

amendments filed pursuant to the 1933 Act, (ii) on the same day as the release thereof, facsimile or e-mailed copies of all press releases issued by the Company or any of its Subsidiaries, and (iii) copies of any notices and other information made available or given to the stockholders of the Company generally, contemporaneously with the making available or giving thereof to the stockholders.

(f)   Listing.   The Company shall promptly secure the listing of all of the Registrable Securities (as defined in the Registration Rights Agreement) upon each national securities exchange and automated quotation system, if any, upon which the Common Stock is then listed (subject to official notice of issuance) and shall maintain such listing of all Registrable Securities from time to time issuable under the terms of the Transaction Documents. The Company shall maintain the authorization for quotation of the Common Stock on the Principal Market. Neither the Company nor any of its Subsidiaries shall take any action which would be reasonably expected to result in the delisting or suspension of the Common Stock on the Principal Market. The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 4(f).

(g)   Fees.   The Company shall reimburse Magnetar Financial LLC or its designee(s) (in addition to any other expense amounts paid to any Buyer prior to the date of this Agreement) for all reasonable costs and expenses, not to exceed $85,000, incurred in connection with the transactions contemplated by the Transaction Documents (including all reasonable legal fees and disbursements in connection therewith, documentation and implementation of the transactions contemplated by the Transaction Documents and due diligence in connection therewith), which amount shall be non-accountable and withheld by Magnetar Capital Master Fund, Ltd. from its Purchase Price at the Closing. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or broker's commissions (other than for Persons engaged by any Buyer) relating to or arising out of the transactions contemplated hereby, including, without limitation, any fees payable to the Agent. The Company shall pay, and hold each Buyer harmless against, any liability, loss or expense (including, without limitation, reasonable attorney's fees and out-of-pocket expenses) arising in connection with any claim relating to any such payment.

(h)   Pledge of Securities.   The Company acknowledges and agrees that the Securities may be pledged pursuant to an available exemption from registration under the 1933 Act by an Investor (as defined in the Registration Rights Agreement) in connection with a bona fide margin agreement or other loan or financing arrangement that is secured by the Securities. The pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and no Investor effecting a pledge of Securities shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document, including, without limitation, Section 2(g) hereof; provided that an Investor and its pledgee shall be required to comply with the provisions of Section 2(g) hereof in order to effect a sale, transfer or assignment of Securities to such pledgee. The Company hereby agrees to execute and deliver such documentation as a pledgee of the Securities may reasonably request in connection with a pledge of the Securities to such pledge by an Investor.

(i)      Disclosure of Transactions and Other Material Information. On or before 8:30 a.m.. New York Time, on the first Business Day following the date of this Agreement, the Company shall file a Current Report on Form 8-K describing the terms of the transactions contemplated by the Transaction Documents in the form required by the 1934 Act and attaching the material Transaction Documents (including, without limitation, this Agreement (and all schedules to this Agreement), the form of Certificate of Designations, the form of Warrant and the Registration Rights Agreement) (including all attachments, the "**8-K Filing**"). From and after the filing of the 8-K Filing with the SEC. the Company shall have disclosed any material nonpublic information delivered to the Buyers by the Company or any of its Subsidiaries, or any of their respective officers, directors. employees or agents. The Company shall not. and shall cause each of its Subsidiaries and its and each of their respective officers. directors. employees and agents, not to, provide any Buyer with any material. nonpublic information regarding the Company or any of its Subsidiaries from and after the date of this Agreement without the express written consent of such Buyer. In the event of a breach of the foregoing covenant by the Company. or any of its Subsidiaries, or any of its or their respective officers, directors, employees and agents. in addition to any other remedy provided herein or in the Transaction Documents, a Buyer shall have the right to make a public disclosure. in the form of a press release, public advertisement or otherwise. of such material, nonpublic information without the prior approval by the Company. its Subsidiaries, or any of its or their respective officers, directors, employees or agents. No Buyer shall have any liability to the Company, its Subsidiaries. or any of its or their respective officers, directors, employees, stockholders or agents. for any such disclosure. Subject to the foregoing, neither the Company, its Subsidiaries nor any Buyer shall issue any press releases or any other public statements with respect to the transactions contemplated hereby; provided, however, that the Company shall be entitled, without the prior approval of any Buyer, to make any press release or other public disclosure with respect to such transactions (i) in substantial conformity with the 8-K Filing and contemporaneously therewith and (ii) as is required by applicable law and regulations (provided that in the case of clause (i) each Buyer shall be consulted by the Company in connection with any such press release or other public disclosure prior to its release). Without the prior written consent of any applicable Buyer. the Company shall not disclose the name of any Buyer in any filing. announcement, release or otherwise.

(j)      Restriction on Redemption and Cash Dividends; Additional Registration Statements. So long as any Preferred Shares are outstanding. the Company shall not, directly or indirectly. redeem. or declare or pay any cash dividend or distribution on, the Common Stock without the prior express written consent of the holders of Preferred Shares representing not less than a majority of the aggregate number of the then outstanding Preferred Shares. Until the Effective Date of the last Registration Statement required to be filed pursuant to the Registration Rights Agreement, the Company shall not file a registration statement under the 1933 Act relating to securities that are not the Securities, other than as required by the Registration Rights Agreement dated as of December 30. 2005 to which the Company is a party.

(k)      Additional Preferred Shares; Variable Securities; Dilutive Issuances. So long as any Buyer beneficially owns any Securities, the Company will not, without the prior written consent of Buyers holding a majority of the Preferred Shares, issue any Preferred Shares (other than to the Buyers as contemplated hereby or under the Certificate of Designations) and the Company shall not issue any other securities that would cause a breach or default under the

Certificate of Designations or the Warrants. From and after the date of this Agreement, and for so long as any Preferred Shares or Warrants remain outstanding, the Company shall not, in any manner, issue or sell any rights, warrants or options to subscribe for or purchase Common Stock or securities directly or indirectly convertible into or exchangeable or exercisable for Common Stock at a conversion, exchange or exercise price which varies or may vary after issuance with the market price of the Common Stock, including by way of one or more reset(s) to any fixed price unless the conversion, exchange or exercise price of any such security cannot be less than the then applicable Conversion Price (as defined in the Certificate of Designations) with respect to the Common Stock into which any Preferred Shares are convertible or the then applicable Exercise Price (as defined in the Warrants) with respect to the Common Stock into which any Warrant is exercisable. For purposes of clarification, this does not prohibit (i) the issuance of securities with customary "weighted average" or "full ratchet" anti-dilution adjustments which adjust a fixed conversion or exercise price of securities sold by the Company in the future or (ii) the issuance of any securities under the terms and conditions of any rights, warrants, options or securities of the Company issued and outstanding as of the date of this Agreement; provided that none of such rights, options or securities are modified or amended. For so long as any Preferred Shares or Warrants remain outstanding, the Company shall not, in any manner, enter into or affect any dilutive issuance if the effect of such dilutive issuance is to cause the Company to be required to issue upon conversion of any Preferred Shares or exercise of any Warrant any shares of Common Stock in excess of that number of shares of Common Stock which the Company may issue upon conversion of the Preferred Shares and exercise of the Warrants without breaching the Company's obligations under the rules or regulations of the Principal Market.

(l)    Corporate Existence.    So long as any Buyer beneficially owns any Securities, the Company shall not be party to any Fundamental Transaction (as defined in the Certificate of Designations) unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Certificate of Designations and the Warrants.

(m)    Reservation of Shares.    The Company shall take all action necessary to at all times have authorized, and reserved for the purpose of issuance, no less than the sum of (1) 125% of the number of shares of Common Stock issuable upon conversion of the issued and outstanding Preferred Shares, (2) 100% of the number of Dividend Shares issuable pursuant to the terms of the Preferred Shares as of the Trading Day immediately prior to the applicable date of determination and (3) 125% of the number of shares of Common Stock issuable upon exercise of the issued and outstanding Warrants; provided, that the parties acknowledge that the number of shares of Common Stock authorized on the date hereof are, and, on the Closing Date, will be, less than the amount required to satisfy the requirements of this Section 4(m); provided, further, that the Company hereby covenants and agrees to call a meeting of stockholders on or prior to May 15, 2006 (the "Stockholder Approval Deadline") to increase the number of authorized shares of Common Stock to 300,000,000 (the "Stockholder Approval").

(n)    Conduct of Business.    The business of the Company and its Subsidiaries shall not be conducted in violation of any law, ordinance or regulation of any governmental entity, except where such violations would not result, either individually or in the aggregate, in a Material Adverse Effect.

(o)    Additional Issuances of Securities.

(i)    For purposes of this Section 4(o), the following definitions shall apply.

(1)    "**Convertible Securities**" means any stock or securities (other than Options) convertible into or exercisable or exchangeable for shares of Common Stock.

(2)    "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(3)    "**Common Stock Equivalents**" means, collectively, Options and Convertible Securities.

(ii)    The Company will not, directly or indirectly, (A) from the date hereof until two hundred seventy (270) days after the Effective Date of the last Registration Statement required to be filed pursuant to the Registration Rights Agreement, file any registration statement with the SEC other than the Registration Statement (as defined in the Registration Rights Agreement), a registration statement on Form S-8 pursuant to the 1933 Act to register shares of Common Stock issuable pursuant to the Stock Option Program or the Registration Statement contemplated pursuant to the Registration Rights Agreement dated as of December 30, 2005 or,(B) from and after the date hereof until the Effective Date of the last Registration Statement required to be filed pursuant to the registration statement, directly or indirectly, offer, sell, grant any option to purchase, or otherwise dispose of (or announce any offer, sale, grant or any option to purchase or other disposition of) any of its or its Subsidiaries' equity or equity equivalent securities, including without limitation any debt, preferred stock or other instrument or security that is, at any time during its life and under any circumstances, convertible into or exchangeable or exercisable for shares of Common Stock or Common Stock Equivalents (any such offer, sale, grant, disposition or announcement being referred to as a "**Subsequent Placement**").

(iii)    The Company will not, directly or indirectly, effect any Subsequent Placement unless the Company shall have first complied with this Section 4(o)(iii).

(1)    The Company shall deliver to each Buyer that owns, at such time, at least 50% of the Securities that such Buyer purchased at the Closing (including the Securities into which such Preferred Shares and Warrants are convertible or exercisable into), a written notice (the "**Offer Notice**") of any proposed or intended issuance or sale or exchange (the "**Offer**") of the securities being offered (the "**Offered Securities**") in a Subsequent Placement, which Offer Notice shall (w) identify and describe the Offered Securities, (x) describe the price and other terms upon which they are to be issued, sold or exchanged, and the number or amount of the Offered Securities to be issued, sold or exchanged, (y) identify the persons or entities (if known) to which or with which the Offered Securities are to be offered, issued, sold or exchanged and (z) offer to issue and sell to or exchange with such eligible Buyers all of the Offered Securities, allocated among such eligible Buyers (a) based on such Buyer's pro rata

portion of the aggregate number of Preferred Shares purchased hereunder by all such eligible Buyers (the "**Basic Amount**"). and (b) with respect to each eligible Buyer that elects to purchase its Basic Amount. any additional portion of the Offered Securities attributable to the Basic Amounts of other eligible Buyers as such eligible Buyer shall indicate it will purchase or acquire should the other eligible Buyers subscribe for less than their Basic Amounts (the "**Undersubscription Amount**").

(2)     To accept an Offer, in whole or in part, such eligible Buyer must deliver a written notice to the Company prior to the end of the fifth (5th) Business Day after such eligible Buyer's receipt of the Offer Notice (the "**Offer Period**"), setting forth the portion of such eligible Buyer's Basic Amount that such eligible Buyer elects to purchase and. if such eligible Buyer shall elect to purchase all of its Basic Amount, the Undersubscription Amount. if any, that such eligible Buyer elects to purchase (in either case. the "**Notice of Acceptance**"). If the Basic Amounts subscribed for by all eligible Buyers are less than the total of all of the Basic Amounts, then each eligible Buyer who has set forth an Undersubscription Amount in its Notice of Acceptance shall be entitled to purchase, in addition to the Basic Amounts subscribed for, the Undersubscription Amount it has subscribed for: provided, however, that if the Undersubscription Amounts subscribed for exceed the difference between the total of all the Basic Amounts and the Basic Amounts subscribed for (the "**Available Undersubscription Amount**"), each eligible Buyer who has subscribed for any Undersubscription Amount shall be entitled to purchase only that portion of the Available Undersubscription Amount as the Basic Amount of such eligible Buyer bears to the total Basic Amounts of all eligible Buyers that have subscribed for Undersubscription Amounts, subject to rounding by the Company to the extent its deems reasonably necessary.

(3)     The Company shall have five (5) Business Days from the expiration of the Offer Period above to offer, issue, sell or exchange all or any part of such Offered Securities as to which a Notice of Acceptance has not been given by the Buyers (the "**Refused Securities**"), but only to the offerees described in the Offer Notice (if so described therein) and only upon terms and conditions (including, without limitation, unit prices and interest rates) that are not more favorable to the acquiring person or persons or less favorable to the Company than those set forth in the Offer Notice.

(4)     In the event the Company shall propose to sell less than all the Refused Securities (any such sale to be in the manner and on the terms specified in Section 4(o)(iii)(3) above), then each Buyer may, at its sole option and in its sole discretion, reduce the number or amount of the Offered Securities specified in its Notice of Acceptance to an amount that shall be not less than the number or amount of the Offered Securities that such Buyer elected to purchase pursuant to Section 4(o)(iii)(2) above multiplied by a fraction, (i) the numerator of which shall be the number or amount of Offered Securities the Company actually proposes to issue, sell or exchange (including Offered Securities to be issued or sold to Buyers pursuant to Section 4(o)(iii)(3) above prior to such reduction) and (ii) the denominator of which shall be the original amount of the Offered Securities. In the event that any Buyer so elects to reduce the number or amount of Offered Securities specified in its Notice of Acceptance, the Company may not

issue, sell or exchange more than the reduced number or amount of the Offered Securities unless and until such securities have again been offered to the Buyers in accordance with Section 4(o)(iii)(1) above.

(5) Upon the closing of the issuance, sale or exchange of all or less than all of the Refused Securities, the Buyers shall acquire from the Company, and the Company shall issue to the Buyers, the number or amount of Offered Securities specified in the Notices of Acceptance, as reduced pursuant to Section 4(o)(iii)(3) above if the Buyers have so elected, upon the terms and conditions specified in the Offer. The purchase by the Buyers of any Offered Securities is subject in all cases to the preparation, execution and delivery by the Company and the Buyers of a purchase agreement relating to such Offered Securities reasonably satisfactory in form and substance to the Buyers and their respective counsel.

(6) Any Offered Securities not acquired by the Buyers or other persons in accordance with Section 4(o)(iii)(3) above may not be issued, sold or exchanged until they are again offered to the Buyers under the procedures specified in this Agreement.

(iv) The restrictions contained in subsections (ii) and (iii) of this Section 4(o) shall not apply in connection with the issuance of any Excluded Securities (as defined in the Certificate of Designations).

(p) Appointment of CFO. Not later than 90 days after the Closing Date, the Company shall have appointed a chief financial officer (other than John Levy) reasonably acceptable to Magnetar Capital Master Fund, Ltd.

(q) Investor Relations Firm. Not later than 120 days after the Closing Date, the Company shall have hired an investor relations firm reasonably acceptable to Magnetar Capital Master Fund, Ltd.

(r) Restrictions on Short Sales. Until the earlier of the first Effective Date and the 50% Effectiveness Deadline (as such terms are defined in the Registration Rights Agreement), each Buyer hereby agrees not to enter into any Short Sales with respect to the Common Stock of the Company. As used herein, "**Short Sales**" shall have the meaning ascribed to such term in Rule 3b-3 of the Exchange Act and Rule 200 promulgated under Regulation SHO under the Exchange Act.

(s) Incurrence of Indebtedness. Until such time as the Buyers hold less than 20% of the Registrable Securities (as defined in the Registration Rights Agreement), the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness other than as provided in Schedule 3(s) hereto or as contemplated in Schedule 4(s) hereto.

5. REGISTER; TRANSFER AGENT INSTRUCTIONS.

(a) Register. The Company shall maintain at its principal executive offices (or such other office or agency of the Company as it may designate by notice to each holder of

Securities), a register for the Preferred Shares and the Warrants in which the Company shall record the name and address of the Person in whose name the Preferred Shares and the Warrants have been issued (including the name and address of each transferee), the number of Preferred Shares held by such Person, the number of Conversion Shares issuable upon conversion of the Preferred Shares and Warrant Shares issuable upon exercise of the Warrants held by such Person. The Company shall keep the register open and available at all times during business hours for inspection of any Buyer or its legal representatives.

(b)    Transfer Agent Instructions.    The Company shall issue irrevocable instructions to its transfer agent, and any subsequent transfer agent, to issue certificates or credit shares to the applicable balance accounts at The Depository Trust Company ("**DTC**"), registered in the name of each Buyer or its respective nominee(s), for the Conversion Shares, and the Warrant Shares in such amounts as specified from time to time by each Buyer to the Company upon conversion of the Preferred Shares or exercise of the Warrants in the form of Exhibit D attached hereto (the "**Irrevocable Transfer Agent Instructions**"). The Company warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5(b), and stop transfer instructions to give effect to Section 2(g) hereof, will be given by the Company to its transfer agent with respect to the Securities, and that the Securities shall otherwise be freely transferable on the books and records of the Company, as applicable, and to the extent provided in this Agreement and the other Transaction Documents. If a Buyer effects a sale, assignment or transfer of the Securities in accordance with Section 2(g), the Company shall permit the transfer and shall promptly instruct its transfer agent to issue one or more certificates or credit shares to the applicable balance accounts at DTC in such name and in such denominations as specified by such Buyer to effect such sale, transfer or assignment. In the event that such sale, assignment or transfer involves Conversion Shares and Warrant Shares sold, assigned or transferred pursuant to an effective registration statement or pursuant to Rule 144, the transfer agent shall issue such Securities to the Buyer, assignee or transferee, as the case may be, without any restrictive legend. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to a Buyer. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5(b) will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5(b), that a Buyer shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

6.    CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.

(a)    The obligation of the Company hereunder to issue and sell the Preferred Shares and the related Warrants to each Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing each Buyer with prior written notice thereof:

(i)    Such Buyer shall have executed each of the Transaction Documents to which it is a party and delivered the same to the Company.

(ii)     Such Buyer and each other Buyer shall have delivered to the Company the Purchase Price (less, in the case of Magnetar Capital Master Fund, Ltd., the amount withheld pursuant to Section 4(g)) for the Preferred Shares and the related Warrants being purchased by such Buyer at the Closing (i) by wire transfer of immediately available funds pursuant to the wire instructions provided by the Company or (ii) by exchange of the outstanding principal and interest of the Exchangeable Notes pursuant to the terms thereof.

(iii)     The representations and warranties of such Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and such Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by such Buyer at or prior to the Closing Date.

7.     CONDITIONS TO EACH BUYER'S OBLIGATION TO PURCHASE.

(a)     The obligation of each Buyer hereunder to purchase the Preferred Shares and the related Warrants at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for each Buyer's sole benefit and may be waived by such Buyer at any time in its sole discretion by providing the Company with prior written notice thereof:

(i)     The Company shall have executed and delivered to such Buyer (A) each of the Transaction Documents and (B) the number of Preferred Shares as is set forth across from such Buyer's name in column (3) of the Schedule of Buyers and the related Warrants for that number of shares of Common Stock as is set forth across from such Buyer's name in column (4) of the Schedule of Buyers being purchased by such Buyer at the Closing pursuant to this Agreement.

(ii)     Such Buyer shall have received the opinion of Holland & Knight, LLP, the Company's outside counsel, dated as of the Closing Date, in substantially the form of Exhibit E attached hereto.

(iii)     The Company shall have delivered to such Buyer a copy of the Irrevocable Transfer Agent Instructions, in the form of Exhibit D attached hereto, which instructions shall have been delivered to and acknowledged in writing by the Company's transfer agent.

(iv)     The Company shall have delivered to such Buyer a certificate evidencing the formation and good standing of the Company and each of its Subsidiaries by the Secretary of State (or equivalent) in its jurisdiction of formation as of a date within ten (10) days of the Closing Date.

(v)     The Company shall have delivered to such Buyer a certificate evidencing the Company's qualification as a foreign corporation and good standing issued by the Secretary of State (or comparable office) of each jurisdiction in which the Company conducts business and is required to so qualify, as of a date within 10 days of the Closing Date.

(vi)    The Company shall have delivered to such Buyer a certified copy of the Certificate of Incorporation as certified by the Secretary of State of the State of Nevada within ten (10) days of the Closing Date.

(vii)    The Company shall have delivered to such Buyer a certificate, executed by the Secretary of the Company and dated as of the Closing Date, as to (i) the resolutions consistent with Section 3(b) as adopted by the Company's Board of Directors in a form reasonably acceptable to such Buyer, (ii) the Certificate of Incorporation and (iii) the Bylaws, each as in effect at the Closing, in the form attached hereto as Exhibit F.

(viii)    The representations and warranties of the Company shall be true and correct as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all respects with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Closing Date.  Such Buyer shall have received a certificate, executed by the Chief Executive Officer of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by such Buyer in the form attached hereto as Exhibit G.

(ix)    The Company shall have delivered to such Buyer a letter from the Company's transfer agent certifying the number of shares of Common Stock outstanding as of a date within five days of the Closing Date.

(x)    The Common Stock (I) shall be designated for quotation or listed on the Principal Market and (II) shall not have been suspended, as of the Closing Date, by the SEC or the Principal Market from trading on the Principal Market nor shall suspension by the SEC or the Principal Market have been threatened, as of the Closing Date, either (A) in writing by the SEC or the Principal Market or (B) by falling below the minimum maintenance requirements of the Principal Market.

(xi)    The Company shall have obtained all governmental, regulatory or third party consents and approvals, if any, necessary for the sale of the Securities.

(xii)    The Certificate of Designations in the form attached hereto as Exhibit A shall have been filed with the Secretary of State of the State of Nevada and shall be in full force and effect, enforceable against the Company in accordance with its terms and shall not have been amended.

(xiii)    The Company, contemporaneously with the Closing, shall have consummated the transactions contemplated by the Asset Purchase Agreement dated as of February 16, 2006 by and among the Company and California Natural Products, Inc. (the "**Savannah Purchase Agreement**") in the form attached hereto as Exhibit H.

(xiv)    The Board of Directors of the Company shall have authorized a formal stock option program (the "**Stock Option Program**") on terms acceptable to the Buyers.

(xv)    The Company shall have taken all necessary action to authorize the designation of one member of the board of directors of the Company by Magnetar Capital Master Fund, Ltd., such that at any time that Magnetar Capital Master Fund, Ltd. continues to own any Preferred Shares, it shall have the right, by written request to the Company, to designate a representative, chosen by it in its sole discretion, to the board of directors of the Company

(xvi)    The Company and Duane N. Martin, Marc R. Fry, Ralph M. Passino, Joseph Balistreri, Charles Sizer, Newlin Martin and Bruce Neviaser shall have executed and delivered to the Buyers a Voting Agreement in the form attached hereto as Exhibit I.

(xvii)    The Company shall have delivered a duly executed lock-up agreement from each of Duane N. Martin and Marc R. Fry, each in the form attached hereto as Exhibit J.

(xviii)    The Company shall have delivered to such Buyer such other documents relating to the transactions contemplated by this Agreement as such Buyer or its counsel may reasonably request.

8.    TERMINATION.  In the event that the Closing shall not have occurred with respect to a Buyer on or before five (5) Business Days from the date hereof due to the Company's or such Buyer's failure to satisfy the conditions set forth in Sections 6 and 7 above (and the nonbreaching party's failure to waive such unsatisfied condition(s)), the nonbreaching party shall have the option to terminate this Agreement with respect to such breaching party at the close of business on such date without liability of any party to any other party; provided, however, if this Agreement is terminated pursuant to this Section 8, the Company shall remain obligated to reimburse the non-breaching Buyers for the expenses described in Section 4(g) above.

9.    MISCELLANEOUS.

(a)    Governing Law; Jurisdiction; Jury Trial.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.  Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.  **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT**

MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(b)    Counterparts.  This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile signature.

(c)    Headings.    The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d)    Severability.  If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e)    Entire Agreement; Amendments.    This Agreement and the other Transaction Documents supersede all other prior oral or written agreements between the Buyers, the Company, their Affiliates and Persons acting on their behalf with respect to the matters discussed herein, and this Agreement, the other Transaction Documents and the instruments referenced herein and therein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters.  No provision of this Agreement may be amended other than by an instrument in writing signed by the Company and the holders of at least a majority of the Preferred Shares issued and issuable hereunder, and any amendment to this Agreement made in conformity with the provisions of this Section 9(e) shall be binding on all Buyers and holders of Securities, as applicable.  No provision hereof may be waived other than by an instrument in writing signed by the party against whom enforcement is sought.  No such amendment shall be effective to the extent that it applies to less than all of the holders of the Preferred Shares then outstanding.  No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration also is offered to all of the parties to the Transaction Documents, holders of Preferred Shares or holders of the Warrants, as the case may be.  The Company has not, directly or indirectly, made any agreements with any Buyers relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents.  Without limiting the foregoing, the Company confirms that, except as set forth in this Agreement, no Buyer has made any commitment or promise or has any other obligation to provide any financing to the Company or otherwise.

(f)    Notices.  Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt,

when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

Universal Food & Beverage Company
3830 Commerce Drive,
St. Charles, Illinois 60174
Telephone:     (630) 584-8670
Facsimile:     (630) 584-8674
Attention:     Chief Executive Officer

With a copy (for informational purposes only) to:

Holland & Knight, LLP
131 S. Dearborn, 30th Floor
Chicago, IL 60603
Telephone:     (312) 263-3600
Facsimile:     (312) 578-6666
Attention:     Carl Neumann, Esq.

If to the Transfer Agent:

Interwest Transfer Co., Inc.
1981 East 4800 South, Suite 100
Salt Lake City, UT 84117
Telephone:     (801) 272-9294
Facsimile:     (801) 277-3147
Attention:     Melina Orth

If to a Buyer, to its address and facsimile number set forth on the Schedule of Buyers, with copies to such Buyer's representatives as set forth on the Schedule of Buyers,

with a copy (for informational purposes only) to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Telephone:     (212) 756-2000
Facsimile:     (212) 593-5955
Attention:     Eleazer N. Klein, Esq.

or to such other address and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of

such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

(g)     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, including any purchasers of the Preferred Shares or the Warrants.  The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the holders of at least a majority of the aggregate number of Registrable Securities issued and issuable hereunder, including by way of a Fundamental Transaction (unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Certificate of Designations and the Warrants).  A Buyer may assign some or all of its rights hereunder in connection with transfer of any of its Securities without the consent of the Company, in which event such assignee shall be deemed to be a Buyer hereunder with respect to such assigned rights.

(h)     No Third Party Beneficiaries.  This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and, except as set forth in Section 9(k) below, is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

(i)     Survival.  Unless this Agreement is terminated under Section 8, the representations and warranties of the Company and the Buyers contained in Sections 2 and 3 and the agreements and covenants set forth in Sections 4, 5 and 9 shall survive the Closing.  Each Buyer shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

(j)     Further Assurances.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k)     Indemnification.  In consideration of each Buyer's execution and delivery of the Transaction Documents and acquiring the Securities thereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless each Buyer and each other holder of the Securities and all of their stockholders, partners, members, officers, directors, employees and direct or indirect investors and any of the foregoing Persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "**Indemnitees**") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "**Indemnified Liabilities**"), incurred by any Indemnitee as a result of, or arising out of, or

relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby or (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company) and arising out of or resulting from (i) the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (ii) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities, (iii) any disclosure made by such Buyer pursuant to Section 4(i), or (iv) the status of such Buyer or holder of the Securities as an investor in the Company pursuant to the transactions contemplated by the Transaction Documents. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. Except as otherwise set forth herein, the mechanics and procedures with respect to the rights and obligations under this Section 9(l) shall be the same as those set forth in Section 6 of the Registration Rights Agreement.

(l) <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(m) <u>Remedies</u>. Each Buyer and each holder of the Securities shall have all rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law. Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Furthermore, the Company recognizes that in the event that it fails to perform, observe, or discharge any or all of its obligations under the Transaction Documents, any remedy at law may prove to be inadequate relief to the Buyers. The Company therefore agrees that the Buyers shall be entitled to seek temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without posting a bond or other security.

(n) <u>Payment Set Aside</u>. To the extent that the Company makes a payment or payments to the Buyers hereunder or pursuant to any of the other Transaction Documents or the Buyers enforce or exercise their rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, foreign, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

(o)     <u>Independent Nature of Buyers' Obligations and Rights</u>.  The obligations of each Buyer under any Transaction Document are several and not joint with the obligations of any other Buyer, and no Buyer shall be responsible in any way for the performance of the obligations of any other Buyer under any Transaction Document.  Nothing contained herein or in any other Transaction Document, and no action taken by any Buyer pursuant hereto or thereto, shall be deemed to constitute the Buyers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Buyers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents and the Company acknowledges that the Buyers are not acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Buyer confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors.  Each Buyer shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Transaction Documents, and it shall not be necessary for any other Buyer to be joined as an additional party in any proceeding for such purpose.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**

**UNIVERSAL FOOD & BEVERAGE COMPANY**

By: _____

       Name: Duane N. Martin
       Title: Chief Executive Officer

**IN WITNESS WHEREOF**, each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above

**BUYERS:**

**CRESTVIEW CAPITAL MASTER, L.L.C.**

_____

By:
Its:

**IN WITNESS WHEREOF**, each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above

**BUYERS:**

**MIDSUMMER INVESTMENT, LTD.**

_____

By:
Its:

**IN WITNESS WHEREOF**, each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**BUYERS:**

**KAUAI PARTNERS, L.P.**

_____

By:
Its: